CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 03 2019

JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| HARRY WORKMAN, | ) |
| | ) |
| Plaintiff, | ) Case No. 5:17-cv-00108 |
| | ) |
| v. | ) |
| | ) By: Michael F. Urbanski |
| AXALTA COATING SYSTEMS, LLC, | ) Chief United States District Judge |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Harry Workman was injured by an electric shock received while installing a conveyor system at defendant Axalta Coating Systems, LLC's ("Axalta") facility in Front Royal, Virginia on October 21, 2015. Workman contends that he was shocked because Axalta improperly wired an explosion proof ("XP") plug to the end of an extension cord supplied by him to provide power to Workman's stud welder. While there was little dispute that the electric shock stemmed from a flaw in the extension cord, Axalta contests whether Workman proved that the shock stemmed from faulty wiring of the XP plug as opposed to some unknown infirmity with the extension cord. After a four-day trial, dueling experts, and multiple opportunities to hear Workman, a jury found for Workman and awarded him $473,295.22 plus prejudgment interest. J. Civ. Action, ECF No. 60.

This matter is before the court on Axalta's Renewed Motion for Judgment as a Matter of Law and for New Trial, ECF No. 67. Testing conducted by Axalta

immediately after Workman was shocked revealed an electrical fault in the extension cord, somewhere between the XP plug wired by Axalta and the rest of the cord supplied by Workman. Workman's expert electrical engineer, Charles Martorana, testified that he ruled out other problems with Workman's extension cord because it worked without flaw before and after the shock to Workman on October 21, 2015. Axalta contends that Martorana's opinion was undermined because Workman could not definitively establish that the extension cord functioned properly after the incident. As such, Axalta argues that that the verdict lacked a legally sufficient basis. Axalta alternatively seeks a new trial, arguing that the verdict was against the great weight of the evidence and was based on a flawed jury instruction.

Although the eventual whereabouts of the extension cord were not established with certainty, the court concludes that, on balance, Workman presented substantial evidence to support the jury's verdict that Axalta was responsible for the electric shock suffered by Workman. Nor is there any basis to grant the motion for new trial. For the reasons discussed below, the court will **DENY** Axalta's motions.

I.

Workman was tasked with working on a metal conveyor system at the Axalta paint plant. Because his work involved the use of a stud welder, Axalta required the welder to be connected to a power source by means of an XP plug. Because of the distance of the stud welder to the power source, Workman needed to use an extension cord he brought with him to Axalta. Richard Bittner, an Axalta electrician, attached the pigtailed wires on the male end of Workman's extension cord to an XP

plug supplied by Axalta. As such, Axalta's liability turns on whether Bittner's wiring was done negligently. Bittner demonstrated for the jury how he wired the XP plug, and testified that it went "together pretty effortlessly." Bittner Trial Test., ECF No. 76, at 39. After the XP plug was attached to a power source, Workman received an electric shock when he touched his unpowered stud welder. Workman collapsed and was taken by ambulance to the hospital.

After the incident, Axalta's David Waddell performed conductivity testing on the extension cord with the XP plug attached. This testing revealed conductivity between ground and hot wires in the extension cord, which was "not the way it should be." Waddell Trial Test., ECF No 73, at 9-10, 17-20. Axalta employees then tried to remove the XP plug from the extension cord, but the XP plug would not unscrew in a normal fashion. Various witnesses testified that, for an unexplained reason, the XP plug was galled, requiring its disassembly by two men using channel lock pliers. Bittner Trial Test., ECF No. 76, at 42-43. The destructive nature of this process wrenched open the XP plug, making it impossible to determine the configuration of its internal wire connections. Waddell Trial Test., ECF No. 73, at 13-14. Significantly, at this point, there was no way to tell from looking at the disassembled XP plug whether it had been correctly wired.

Workman returned to Axalta the next day, but was too frail to complete his work. Rather, his associate loaded the stud welder and other tools on Workman's truck for his return trip to Illinois. Workman did not inventory his tools when he left Axalta, and did not look to see whether his extension cord was returned to its storage

3

compartment on the stud welder. Upon his return from Axalta, Workman had the stud welder examined by its manufacturer, Nelson Stud Welding, Inc., which found no problem with the welder and it integral power cord.

As to the extension cord, although Workman did not see the extension cord when he left Axalta, he believed that it was returned to service and functioned without incident. On direct examination, Workman testified as follows:

> Q. After you did give the stud welder back to the folks at Nelson, did you reunite it to the designated power cord that had been used before the October 21, 2015 accident?
>
> A. I believe so. The reason I say "I believe so" is because that would have been out in the shop; and when I brought the unit back, my partner immediately put the unit back into service.
>
> Q. Did the extension cord go back in the same bed that it had previously been stored in on that machine?
>
> A. It would had to have been used. We had to actually use the extension cord.
>
> Q. Was it actually used by you after October 21, 2015, after it came back from Nelson?
>
> A. When I was in the shop, yes, I used it.
>
> Q. And did it perform as flawlessly as it had before the accident?
>
> A. We had no problem with it whatsoever.
>
> \* \* \*
>
> Q. Since October of 2015, have you used the stud welder with those same extension cords?
>
> A. Definitely.

4

> Q. Ever had any problems since the accident?
>
> A. No, sir.

Workman Trial Test., ECF No. 65, at 19, 88.

Uncertainty arose concerning the extension cord when it did not accompany the stud welder for inspection in connection with this lawsuit. Workman's partner, Dale Chapman, twice sent extension cords to the retained experts for inspection, but neither one turned out to be the cord used on the day Workman was shocked. As of the trial, the extension cord remained missing.[1]

On cross-examination and when called by Axalta as an adverse witness in its case, Workman conceded that he could not be certain whether the extension cord at issue was loaded onto his truck the day after he was shocked, and that it was possible that it was left at Axalta. Workman testified:

> Q. You have no idea if you ever saw the extension cord you brought to the Axalta facility October 21, 2015, after the date of the occurrence; correct?
>
> A. Correct.
>
> \* \* \*
>
> Q. You never received that cord back, to the best of your knowledge; right? You don't know one way or the other.
>
> A. I don't know.
>
> Q. So you don't know whether it was ever put back in production either because you don't know if you ever received it back.

---

[1] Nor was the XP plug ever examined by the retained experts as it too could not be found.

A. I believed at that time that I did receive it. There was no reason for me to believe that it was not in there and I - -

Q. You haven't seen it since, have you?

A. I don't know.

Q. You don't know whether or not you've ever used it since the date of the occurrence, do you?

A. I believe I did.

                     \*    \*    \*

Q. Sir, you're saying, "I believe it." Do you know it?

A. It's - - I don't believe it's a yes or no answer.

Q. Do you know for a fact that that cord was placed into production following the occurrence because you saw it, used it yourself, et cetera; that you know it?

A. I believe that's an impossible question.

                     \*    \*    \*

THE WITNESS: The cords do not have numbers on the, or anything like that. I don't - - I have a very, very small shop. I've only got two employees. It's not like I have rows and rows and rows of these cords. There's four units. There's four extension cords.

                     \*    \*    \*

Q. Your shop presently only has three cords. One is missing; correct?

A. I believe.

Q. You don't know which cord is missing or when that fourth cord went missing; correct?

A. Correct.

* * *

Q. We don't know if the cord was ever returned to you, which would lead to the conclusion we don't know if it was ever placed back in production because it's missing; right?

A. Yes.

Workman Trial Test., ECF No. 65, at 92; ECF No. 66 at 3-6., 19, 88.

Workman wrapped up his trial testimony with his belief that he took home the extension cord from the Axalta plant and that it worked fine afterwards. When asked why he held this belief, Workman testified:

Q. Why do you believe that, Mr. Workman?

A. I had no reason not to believe it. It's - - everything was loaded up in - - I believed it. I believed it at the time, yes. Everything I took there, I came home with; and it was later determined I had left some very important tools there, they were nice enough to send them back a couple weeks later.

* * *

Q. Mr. Workman, the question is, after the accident occurred, do you - - did you or, to your knowledge, any of your employees ever have a problem with the stud welder, the integral cord attached to the stud welder or the extension cord that you brought home with your from Axalta on . . . October 22, 2015?

A. We had no problems with it whatsoever, and please remember that there's only two people. There's only two possibilities that could ever do that. It would either be myself or my partner, and my partner does not go on the road.

7

Workman Trial Test., ECF No. 66, at 24, 28.

Charles Martorana, Workman's expert electrical engineer, pinpointed the source of the shock as the XP plug he opined had been miswired by Axalta. Because Martorana could not examine the missing extension cord, he eliminated the cord as the source of the shock because "[t]he extension cord that lived inside of Mr. Workman's welder functioned properly prior to the incident and after the incident." Martorana Trial Test., ECF No. 75, at 35. Martorana based his opinion in part on the fact that Workman told him that the cord was available after the occurrence and continued to function. Mortorana stated that it was news to him if that was not true. Id.

## II.

Rule 50(b) of the Federal Rules of Civil Procedure allows the parties to renew a motion for judgment as a matter of law made under Rule 50(a) following a jury verdict and judgment. A district court should grant a Rule 50(b) motion only if the court "determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 532 (4th Cir. 2002) (quoting Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999)). In ruling on the motion, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001). The court may not substitute its judgment for that of the jury and must uphold the verdict if there is evidence upon which a reasonable jury could

return a verdict in favor of the nonmoving party. Price v. City of Charlotte, 93 F.3d 1241, 1249-50 (4th Cir. 1996).

At the same time, while a court is "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, [it is] not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdicts if the evidence cannot support it." Id. at 1250 (internal citations omitted). "The question on a motion for judgment as a matter of law is thus not whether the plaintiff previously satisfied some loose proxy, but rather whether the trial record evinces a 'legally sufficient evidentiary basis for a reasonable jury" to have reached its verdict. Fed. R. Civ.P. 50(a)(1); Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). Where, as here, causation is dispositive, the proper test is of "'probability,' 'reasonable probability,' 'substantial probability' rather than mere 'possibility.'" Lovelace v. Sherwin-Williams Co., 681 F.2d 240, 242 (4th Cir. 1982). This level of proof is required to avoid the "special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere 'possibilities,' by impermissible but understandable resort to such factors such as sympathy and the like." Id.

Axalta centers its attack on the jury verdict on Workman's failure to rule out a defect in the missing extension cord as the source of the shock. To be sure, Workman did not inventory his equipment upon leaving Axalta and testified that he could not be certain that the extension cord was there when he left. But Workman

testified over and over again that he believed, from the small nature of his shop and their continued operation over ensuing months, that the stud welder and associated extension cord was present and functioned just as before. In order to credit Axalta's position at this stage, the court would have to disregard Workman's testimony and instead view the evidence in the light most favorable to Axalta. The issue of whether the extension cord returned from Axalta and operated without incident turns entirely on the credibility of Workman's testimony. Even though Workman did not inventory his tools when his truck left Axalta and could not later produce the extension cord for inspection, the question whether the extension cord was returned and continued to work was probed over and over by counsel and the jury had ample opportunity to assess Workman's credibility on this issue. Credibility determinations are quintessentially the province of the jury. See Conner v. Schrader-Bridgeport Int'l, Inc., 227 F. 3d 179, 199-200 (4th Cir. 2000). The court will not disturb the jury's determination that Workman's testimony was credible.

Axalta's focus on Workman's failure to establish with certainty that the extension cord was loaded on his truck after being shocked also ignores the other evidence supporting the jury verdict in this case. First, it was uncontroverted that there were no problems with any of Workman's equipment, including the extension cord, before the XP plug was attached. Second, Axalta's Waddell testified that after Workman was shocked, the extension cord failed a conductivity test, indicating that one of its hot wires was improperly connected to a ground wire. Third, while Bittner testified that he connected the extension cord to the XP plug "effortlessly," multiple

Atlas Food Sys. and Servs., Inc. v. Crane Nat. Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996); Cline v. Wal-Mart Stores, Inc., 144 F.3d at 301.

To the extent that Axalta's motion for new trial is premised on the sufficiency of the evidence surrounding the extension cord, it is **DENIED** for the same reasons as the Rule 50 motion. The jury had ample opportunity to assess the credibility of Workman's testimony that, while he could not be certain, he believed the extension cord in question was used without incident after he was shocked at Axalta. In addition, other evidence supported the jury's verdict. The evidence was undisputed that the extension cord functioned properly prior to Workman being shocked. Waddell's testimony that a hot wire was connected to a ground wire when the cord was tested immediately after the shock also was undisputed. Bittner's testimony that he connected the extension cord to the XP plug effortlessly and correctly was undermined by the fact that it took two workers with channel lock pliers to wrench it apart after Workman was shocked. Given these facts, even though the operation of the extension cord after Workman left Axalta was subject to much disagreement and debate at trial, it cannot be maintained that the verdict was against the clear weight of the evidence or resulted in a miscarriage of justice.

Finally, Axalta claims that it is entitled to a new trial based on a flawed jury instruction. The jury instructions, as a whole, must "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir. 1987). Erroneous jury instructions "will mandate reversal of a judgment only if the

witnesses testified that it could not be unscrewed normally. Rather it took two workers with channel lock pliers to wrench apart the XP plug such that the configuration of the internal wire connections could not be determined thereafter. Although no one could say why the XP plug could not be disassembled normally, given the difficulties encountered in disconnecting the XP plug in this case, the jury was certainly free to discount Bittner's testimony that it went together effortlessly and make the reasonable inference that it had been connected improperly.

Because there is substantial evidence, direct and circumstantial, to support the jury's verdict, Axalta's renewed motion for judgment as a matter of law must be **DENIED**.

### III.

Alternatively, Axalta seeks a new trial. The grant or denial of a motion for a new trial is entrusted to and a matter resting in the sound discretion of the district court. Wadsworth v. Clindon, 846 F.2d 265, 266 (4th Cir. 1988) (citing Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne, 386 F.2d 193 (4th Cir. 1967)). The motion may be granted, "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The United States Court of Appeals for the Fourth Circuit's list of acceptable grounds for which a court may exercise its discretion to grant a new trial includes: "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."

11

error is determined to have been prejudicial, based on a review of the record as a whole." Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir. 1983).

Axalta complains of a single instruction, which summarized Workman's allegations as follows:

> In this case, plaintiff Harry Workman raises a single claim against defendant Axalta Coating Systems, LLC: the defendant negligently connected the plaintiff's stud welder to the power supply.

Final Jury Instructions ("Jury Instructions"), ECF No. 57, at 17.

Axalta objects to this instruction, claiming that "[t]he only evidence presented at trial by Plaintiff concerned whether Mr. Bittner properly connected Plaintiff's extension cord to an explosion proof plug." Mem. in Supp. of Renewed Mot. for J. as a Matter of Law, ECF No. 67-1, at 10. Axalta concludes that "[t]he instruction substantially enlarged Defendant's duty, allowing the jury to conclude that Axalta was not merely responsible for the connection it made . . . but also responsible for checking all connections between Plaintiff's welder and the power source." Id. at 4.

The jury instruction complained of by Axalta simply recites Workman's allegation of negligence. This instruction was consistent with Workman's Amended Complaint, where he claimed that "[d]efendant Axalta and its employees were negligent in the manner in which the stud welder was connected to electrical power, specifically by making improper electrical connections, and by allowing the stud welder to become energized so that it posed an unreasonable danger to anyone who might touch it, including plaintiff . . . ." Amended Complaint, ECF No. 16, at ¶ 21.

Also, this was the same instruction given in the preliminary instructions to the jury, to which Workman did not object.

Regardless, it is inconceivable that this single jury instruction could cause the jury to conclude that Axalta was responsible for any failure of Workman's equipment or for Workman's own negligence. There was no dispute in the facts presented at trial that there was no electrical problem with either the stud welder and its integral power cord or with Axalta's provision of power to the outlet on the plant floor. The entire issue in the case surrounded the extension cord supplied by Workman connecting the power source (the outlet on the plant floor) to the integral cord on the stud welder. Axalta's only role with regard to that extension cord was the connection of the XP plug, which Workman argued was flawed based on Waddell's testing of the cord after Workman was shocked. At trial, Axalta argued that Workman could not prove by preponderance of the evidence that the shock resulted from a miswired XP plug, as opposed to an underrated or degraded extension cord or Workman's contributory negligence. As the evidence surrounding Axalta's role in the connection of the stud welder to the power source centered on Bittner's connection of the extension cord to the XP plug, there is no likelihood that this instruction restating Workman's allegation of negligence confused the jury or impermissibly expanded the scope of Axalta's potential liability.

Indeed, the jury was instructed that the mere happening of the accident did not entitle Workman to recover and was fully charged on the issue of contributory negligence. Each side focused their evidence and argument on the extension cord,

Workman asserting that the evidence showed the XP plug was miswired, and Axalta focusing on potential hazards posed by possible degradation of the cord itself or an unspecified problem with the female plug on the other end. Given the entirety of the instructions and the evidence in this case, Axalta's claim that its liability was impermissibly broadened by the statement of Workman's allegation in this instruction is unfounded. Taken as a whole, and considered in the context of the evidence in this case, the challenged instruction presented no confusion to the jury nor posed any prejudice to Axalta. The court cannot conclude that this instruction resulted in a miscarriage of justice justifying a new trial.

### III.

In sum, the court concludes that substantial evidence existed supporting the jury's verdict, that the verdict was not against the clear weight of the evidence, and that the verdict in this case does not represent a miscarriage of justice. As such, Axalta's Renewed Motion for Judgment as a Matter of Law and for a New Trial, ECF No. 67, is **DENIED**.

Entered: May 3, 2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge